# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DAMON CAMPAGNA, LILY ROSE SMITH, and PATRICK SPAULDING,<br><br>*Plaintiffs*,<br><br>v.<br><br>BOSTON RED SOX BASEBALL CLUB, L.P. and FENWAY SPORTS GROUP HOLDINGS, LLC,<br><br><br>*Defendants*. | Case No. 1:26-cv-10182 |

## CLASS ACTION COMPLAINT

Plaintiffs Damon Campagna, Lily Rose Smith, and Patrick Spaulding ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendants Boston Red Sox Baseball Club, L.P. and Fenway Sports Group Holdings, LLC (collectively, the "Red Sox" or "Defendants") and allege as follows on information and belief:

## INTRODUCTION

1.      For years, the Red Sox falsely advertised the prices for tickets to baseball games and other events at Fenway Park.  The Red Sox's false advertising has cost ticket purchasers millions of dollars in total.

2.      The Red Sox's false advertising centers on their use of drip pricing and junk fees. Specifically, the Red Sox would advertise illusorily low prices for their tickets.  When purchasers attempted to buy those tickets, however, the Red Sox would add mandatory fees at the last minute, such as "Per-Ticket Fees" and "Order Fees," that could increase the cost of a purchase by as much as 150%.

3.      In other words, the Red Sox's advertised tickets were not actually available for purchase at the advertised prices.

4.      The Red Sox's use of drip pricing and junk fees was both unfair and deceptive.  It was also illegal under the consumer protection laws of Massachusetts and other states.

5.      The Massachusetts Consumer Protection Act ("CPA"), Mass. Gen. Laws ch. 93A, along with subsequent consumer protection regulations promulgated by the Massachusetts Attorney General (including 940 Mass. Code Regs. §§ 3.04, 3.13, and 3.16), require businesses to sell goods and services for their advertised prices.  Other states' consumer protection laws impose similar requirements.  The Red Sox's deceptive advertisements of tickets for below their true cost is classic bait-and-switch advertising that applicable law prohibits.

6.      Plaintiffs bring this action on behalf of a class of ticket buyers to seek redress for the Red Sox's violations of Mass. Gen. Laws ch. 93A and other state consumer protection laws. The Red Sox's illegal practices deprived Plaintiffs and members of the class of truthful, salient price information, causing them to pay more than the advertised price.  Plaintiffs seek damages (including multiple damages), prejudgment interest, and reasonable attorneys' fees and costs.

## PARTIES

### A.      Plaintiffs

7.      Plaintiff Damon Campagna is a resident of Rhode Island.  He purchased tickets from the Red Sox in July 2023.  He was subjected to unfair and deceptive false advertising in connection with those purchases because the Red Sox omitted their mandatory fees from their price advertising but added them after Mr. Campagna had already selected tickets and proceeded to the checkout page of the Red Sox's online sales flow.

8.      Plaintiff Lily Rose Smith is a resident of Massachusetts.  She is an avid Red Sox fan and has purchased tickets from the Red Sox on several occasions since January 2022.  The Red

Sox have repeatedly engaged in deceptive false advertising in connection with Ms. Smith's ticket purchases and have imposed additional—but different and generally unpredictable—junk fees on her ticket orders, in amounts ranging from $0.50 to $10.50.

9.      Plaintiff Patrick Spaulding is a resident of Connecticut.  He has purchased Red Sox tickets on multiple occasions since January 2022 and similarly was subjected to the Red Sox's false advertising and imposition of unfair and deceptive junk fees.

**B.    Defendants**

**a.    Identity of Defendants**

10.     Defendant Boston Red Sox Baseball Club, L.P. is a limited partnership organized under the laws of Massachusetts.  Its principal place of business is at 4 Jersey Street, Boston, Massachusetts 02215.

11.     Boston Red Sox Baseball Club, L.P.'s sole general partner is New England Sports Ventures, LLC (NESV), which is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.[1]

12.     Because Boston Red Sox Baseball Club, L.P. is a partnership, it is a resident of each state in which one of its partners is a resident.

13.     Boston Red Sox Baseball Club, L.P. does business as the professional Major League Baseball team, the Boston Red Sox.  Its operations in Massachusetts include the sale and advertising of tickets for events at Fenway Park.

---

[1] NESV renamed itself Fenway Sports Group in 2011, and Plaintiffs believe that NESV is the predecessor name of Defendant Fenway Sports Group Holdings, LLC.  In court filings in 2016, however, Defendant Boston Red Sox Baseball Club, L.P. still identified NESV as its parent company.  Boston Red Sox Baseball Club, L.P. also identified NESV as its general partner in its 2025 Massachusetts annual report.

14.    Defendant Fenway Sports Group Holdings, LLC ("FSG") is a Delaware limited liability company.  Its principal place of business, including the location of multiple of its executive officers, is at 4 Jersey Street, Boston, Massachusetts 02215.

### b.    Defendant Fenway Sports Group Holdings, LLC's Relationship to Defendant Boston Red Sox Baseball Club, L.P.

15.    Defendant Fenway Sports Group Holdings, LLC is the ultimate parent company and controller of Defendant Boston Red Sox Baseball Club, L.P.

16.    Both Defendants share the same principal place of business, with each entity's headquarters located at Fenway Park (4 Jersey Street, Boston, Massachusetts 02215).

17.    Defendant FSG plays an active role in Defendant Boston Red Sox Baseball Club, L.P.'s operations.

18.    Among other things, Defendant FSG shares executives with Defendant Boston Red Sox Baseball Club, L.P., or assigns its own executives to perform executive functions for Defendant Boston Red Sox Baseball Club, L.P.

19.    For example, when identifying its front office staff, *see, e.g.*, https://www.mlb.com/redsox/team/front-office, Defendant Boston Red Sox Baseball Club, L.P. lists several FSG employees as its own executives.  Among others, the General Counsel of Defendant Boston Red Sox Baseball Club, L.P., Ed Weiss, is an employee of Defendant FSG, where he holds the title "Executive Vice President of Corporate Strategy & General Counsel." Other shared or borrowed front office staff include Zineb Curran, who is listed as "SVP/Chief Communications Officer, Fenway Sports Group & Boston Red Sox," and Jamie Bucci, who is listed as "Special Assistant to President of FSG & President/CEO of Boston Red Sox."

20.    Defendant FSG similarly holds out its owners and executives as the owners and executives of Defendant Boston Red Sox Baseball Group, L.P.  For example, on its website, FSG

describes John W. Henry, in his capacity as "founder and the principal owner of Fenway Sports Group," as the "control person" for the Boston Red Sox. *See* https://fenwaysportsgroup.com/leadership/.

21.     Other Red Sox sources also note the overlapping roles of the two Defendants' personnel, including many of Defendant Boston Red Sox Baseball Club, L.P.'s key strategic decisionmakers.  In the "2022 Boston Red Sox Media Guide" issued by the Red Sox, for example, the team noted that its "President & CEO," Sam Kennedy, is simultaneously responsible for "leading the Red Sox front office" and "serv[ing] as Chief Executive for the global sports marketing firm specializing in partnership sales, consulting, and the pursuit of new lines of business for parent company Fenway Sports Group (FSG)."  It similarly stated that the Red Sox's "Executive Vice President/Chief Marketing Officer" simultaneously runs another entity that "provides sales, marketing, and consulting services for parent company Fenway Sports Group[]."

22.     That media guide further noted that the team's "Executive Vice President/Chief Strategy Officer" Dave Beeston, "is charged with creating and executing new business initiatives and new lines of revenue for the Club and Fenway Sports Group (FSG)," and that during his time as a Red Sox executive, he "played an integral role in the significant growth of FSG."

23.     The 2022 media guide further noted that Defendant Boston Red Sox Baseball Club, L.P.'s "Executive Vice President/Chief Operating Officer" "also assumes a key leadership role in coordinating all of Fenway Sports Group's real estate activities."

24.     A recent job posting for a Red Sox ticket sales position highlighted the overlap between FSG and Boston Red Sox Baseball Group, L.P.'s sales operations.  In that posting, Defendant Boston Red Sox Baseball Group, L.P. advertised that dozens of junior Red Sox ticket sales employees "have been promoted within Fenway Sports Group."     *See*

https://www.linkedin.com/jobs/view/2026-junior-sales-associate-at-boston-red-sox-4436264047.

25.    Defendant FSG's activities include control over, responsibility for, or participation in the advertising and sale of tickets for events at Fenway Park.

26.    Sales of tickets to Fenway Park events are a priority for FSG.  One of the "highlights" of FSG's annual partner meeting in 2023, for example, was "Red Sox ticket sales." *See*        https://fenwaysportsgroup.com/wp-content/uploads/2023/03/FSG-Annual-Partners-Weekend-Business-Update-1.pdf.

27.    FSG itself affirmatively organizes events at Fenway Park for which tickets are sold.

28.    For example, FSG was responsible for developing and marketing the Fenway Bowl, a college football game played at Fenway Park.  Those marketing efforts included planning for or involvement in ticket sales.  Shortly before the first Fenway Bowl was scheduled to be played in 2021, an executive of the event's sponsor, Wasabi Technologies, credited FSG with "bring[ing] this experience to life."   *See* https://www.mlb.com/press-release/fenway-bowl-announces-wasabi-technologies-as-title-sponsor.

29.    In its 2022 media guide, Defendant Boston Red Sox Baseball Group, L.P. similarly credited "Fenway Sports Group" with finding "new and exciting ways to showcase the ballpark's multi-use possibilities" in connection with the variety of non-baseball events hosted at Fenway Park over recent years, such as concerts and winter sporting events.

30.    Accordingly, Defendant FSG owns and controls Defendant Boston Red Sox Baseball Club, L.P., staffs the latter's front office with FSG's own executives who are tasked with promoting FSG's business initiatives and corporate strategy, and actively engages in efforts to generate ticket sales for events at Fenway Park.  Defendant FSG therefore controls, is responsible

for, or otherwise participates in the advertising, pricing, and sale of tickets for events at Fenway Park, including Red Sox games.

## JURISDICTION AND VENUE

31.     This case arises under Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 9, and other state consumer protection laws.

32.     This Court has subject matter jurisdiction over this civil action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because:  (1) there are 100 or more class members; (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) at least one member of the class is of diverse citizenship from at least one Defendant.

33.     Plaintiffs require discovery to identify the residency of each of Defendant Boston Red Sox Baseball Club, L.P.'s partners.  However, according to past court filings by Defendant Boston Red Sox Baseball Club, L.P., none of the LLCs with an ownership interest in Boston Red Sox Baseball Club, L.P., and none of the individual members of those LLCs, are residents of Connecticut or New Jersey.  Accordingly, Defendant Boston Red Sox Baseball Club, L.P. is not a resident of Connecticut or New Jersey.  At least one member of the class is a resident of Connecticut or New Jersey.  Therefore, at least one member of the class is of diverse citizenship from Defendant Boston Red Sox Baseball Club, L.P.

34.     This Court has personal jurisdiction over Defendants because:  (1) Defendants have transacted business within Massachusetts, including the sale and delivery of tickets; (2) Defendants are residents of Massachusetts; and (3) Defendants have substantial contacts within Massachusetts.

35.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because Defendants reside and do business in Massachusetts; Fenway Park is located in Suffolk County,

Massachusetts; and a substantial part of the events or omissions giving rise to the unfair and deceptive acts and practices at issue—including the advertising of ticket prices to Massachusetts purchasers, the sale and delivery of tickets for events in Massachusetts, and the imposition of mandatory fees—occurred in this judicial district.

## FACTUAL BACKGROUND

**A.    Drip Pricing and Junk Fees Are Unfair and Deceptive Practices.**

36.    Drip pricing is an unfair and deceptive practice.

37.    A company engages in drip pricing by disclosing only a portion of a product or service's true price initially and then revealing the rest ("dripping" out) later in the purchase process, after the buyer has already expended time and effort selecting the product or service and indicated interest in making a particular purchase.

38.    Drip pricing deceives buyers as to the true purchase price and can lead them to pay more than they would otherwise choose to if they were given truthful and complete information from the outset.  Buyers who are subjected to drip pricing—*i.e.*, who are not provided the complete price until checkout—are likely to proceed with their purchase even if the price is more than they intended to pay and even if further searching could yield a cheaper price because they want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[2]

39.    Additionally, buyers are more likely to purchase more expensive tickets when advertised ticket prices are artificially low due to drip pricing, because they make their ticket

---

[2] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of    Econ.    Fed.    Trade    Comm'n    16-17    (Jan.    2017),    *available    at* https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

selections based on the (falsely) advertised price rather than the true, final prices they will be charged.[3]

40.     Industry research confirms the unfair and deceptive nature of drip pricing, and its significant negative effects on purchasers.  One experiment conducted by live-event ticket seller StubHub demonstrated that hiding mandatory fees from buyers until checkout increases the selling company's revenue by approximately 20%.[4]

41.     Junk fees are a related but distinct unfair and deceptive practice.

42.     "Junk fees" refer to items presented as "fees" in connection with a purchase that do not have independent value or that the buyer would not voluntarily select if given the choice.

43.     The Red Sox's fees at issue in this case, including "Per-Ticket Fees" and "Order Fees," are archetypical examples of junk fees.

44.     As described in greater detail below, during the relevant time period, the Red Sox presented buyers with "Per-Ticket Fees" and "Order Fees" at the final step of their checkout process.  The Red Sox never even pretended that these fees covered anything of value to buyers independent of the tickets the buyers had already shown interest in purchasing.

45.     Sellers like the Red Sox use junk fees because they lead buyers to pay higher prices.

---

[3] Tom Blake, Sarah Moshary, Kane Sweeney & Steve Tadelis, *Price Salience and Product Choice*, 40 Mktg. Sci. 4, 619-636 (2021), *available at* https://faculty.haas.berkeley.edu/stadelis/AIP.pdf; David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 68 (2020) (citing experiments that showed that "price separation" could "enhance" consumers' "perceived value . . . and reduce further information search intentions" because consumers make "insufficient price adjustment" (quoting Lan Xia & Kent Monroe, *Price Partitioning on the Internet*, 18 J. Interactive Mktg. 63 (2004))) (citation modified).

[4] Blake et al., *supra* note 3, at 633.

46.     Studies have found, among other things, that purchasers underestimate the total price of a given product or service when the seller splits out a portion of the price as junk fees (even if the base price plus the junk fees are presented simultaneously).[5]  Studies have also found that buyers are even more likely to underestimate the total price when the font size of the junk fee is smaller than that of the base price.[6]

47.     These unfair and deceptive prices take advantage of the psychological principle of "anchoring and adjustment," in which people "overweight the anchor information (*e.g.*, the base price) and adjust insufficiently for the rest of the information (*e.g.*, the [junk fee])."[7]

48.     Junk fees and drip pricing can be combined, resulting in an even more unfair and deceptive sales practice.  As noted above, junk fees lead purchasers to pay higher prices even when they are disclosed at the same time as the base price.  By hiding the existence and amount of junk fees until late in the transaction process, sellers like the Red Sox can magnify the effects of junk fees, forcing buyers to rely on inaccurately advertised base prices and thereby reducing or eliminating purchasers' ability "to identify the cheapest offer."[8]

---

[5] Sullivan, *supra* note 2, at 21-22.

[6] *Id*. at 25.

[7] *Id.* at 23-24 (citing Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases*, 185 Science 1124, 1124-31 (1974)).

[8] *See, e.g.*, Alexander Rasch et al., *Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior & Org. 353 (2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers based their purchase decision exclusively on the base price."); Shelle Santana, Steven Dallas & Vicki Morwitz, *Consumer Reactions to Drip Pricing*, 39 Mktg. Sci. 188, 189-190 (Jan. 15, 2020) ("[C]onsumers exposed to drip pricing . . . are significantly more likely to (1) initially select the option with the lower base price, (2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and (3) be relatively dissatisfied with their choice.").

49.     Noticing and correctly evaluating junk fees and drip pricing are even harder for consumers when, as here, the seller limits the available time to consider the decision, inducing a sense of urgency.

50.     After consumers saw the advertised price and added the tickets, the Red Sox website began showing a countdown timer of just a few minutes, warning that the tickets may not be available after the timer elapsed.  The countdown rushed consumers through the purchase, impairing their ability to fully understand and react to the drip pricing and junk fees.

51.     Accordingly, when junk fees and drip pricing are combined (as here), purchasers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[9]

52.     Market evidence further confirms the unfair and deceptive nature of hidden junk fees.

53.     Ordinarily, when companies increase prices, they face reduced demand as a consequence.

54.     Companies like the Red Sox are generally able to increase hidden junk fees without suffering meaningful market consequences, however, because hiding the junk fees through drip pricing prevents purchasers from receiving the truthful and complete information they need to make informed purchasing decisions.[10]

---

[9] Sullivan, *supra* note 2, at 4; *see also* Friedman, *supra* note 3, at 67 ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . .  Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[10] Rasch et al., *supra* note 8 ("firms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

55.     Several states have recognized that drip pricing and junk fees are unfair and deceptive practices.  For example, the Attorney General for the District of Columbia has brought an enforcement action against StubHub, Inc., under the District of Columbia's consumer protection statute "for hiding the true price of tickets from consumers and charging hidden fees to increase profits."[11]  The Attorney General of Nebraska has brought an enforcement action against the hotel chain Hilton for its use of drip pricing, noting that this practice "misled or confused [consumers] concerning the true cost of an overnight stay."[12]  And the Attorney General of Connecticut has brought an enforcement action against the internet service provider Altice for "advertis[ing] a price for Internet Service that did not include [a junk fee] but actually charg[ing] many of its Connecticut customers a higher price" that included the fee.[13]

---

[11] Attorney General Schwalb Sues StubHub for Deceptive Pricing & Junk Fees, Office of the Att'y Gen. of D.C. (July 31, 2024), *available at* https://oag.dc.gov/release/attorney-general-schwalb-sues-stubhub-deceptive; Compl. for Injunctive & Other Relief for Violations of the Consumer Protection Procedures Act ¶¶ 4-5, *Dist. of Columbia v. StubHub, Inc.* (D.C. Super. Ct.), *available at* https://oag.dc.gov/sites/default/files/2024-07/2024.07.29%20DC%20OAG%20StubHub%20Complaint%20-%20to%20finalize_Redacted%20%281%29.pdf ("StubHub entices consumers to shop for tickets by displaying deceptively low prices that do not include StubHub's mandatory fees—the bait.  Only after a consumer has chosen tickets and invested time and effort . . . does StubHub reveal the mandatory fees added to the ticket price—the switch.").

[12] Am. Compl. for Injunctive & Other Relief ¶¶ 4, 10, *Nebraska v. Hilton Dopco, Inc.* (Neb. Dist. Ct.), *available at* https://ago.nebraska.gov/sites/ago.nebraska.gov/files/doc/2019.07.24_Hilton%20Dopco%20Inc._Amended%20Complaint.pdf (Nebraska suit against hotel chain Hilton for "drip pricing" whereby consumers are "misled or confused concerning the true cost of an overnight stay").

[13] Compl. ¶ 17, *Connecticut v. CSC Holdings, LLC d/b/a Altice USA* (Conn. Super. Ct.), *available at* https://portal.ct.gov/-/media/ag/press_releases/2024/altice---complaint---51124_redacted.pdf (Connecticut suit against internet service provider Altice USA for "advertis[ing] a price for Internet Service that did not include [a Junk Fee] but actually charg[ing] many of its Connecticut customers a higher price"); *see also* Compl. for Permanent Inj., Monetary J., Civil Penalty J. & Other Relief ¶¶ 3, 7, *FTC v. Greystar Real Estate Partners, LLC* (D. Colo.), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/greystar_complaint_-_filed.pdf (Colorado and FTC suit against multi-family property manager Greystar for "charging 'Hidden Fees'" and "misrepresent[ing] the true cost of renting a unit at its properties").

**B.**    **The Red Sox Engaged in Unfair and Deceptive Drip Pricing and Junk Fee Practices.**

    **i.**    **The Red Sox's Use of Drip Pricing and Junk Fees in Their Sales Process**

56.    The Red Sox advertise and sell tickets for 81 home games each baseball season, along with certain other events at Fenway Park.

57.    Ticket sales are a major source of revenue for the Red Sox.  In the 2024 season, for example, the Red Sox generated well above $200 million in ticket revenues for the season—the fourth highest among all Major League Baseball ("MLB") teams.[14]

58.    In connection with their ticket sales, the Red Sox advertise their tickets through print, broadcast, and internet media.

59.    Many of these advertisements make statements regarding the price of Red Sox tickets.

60.    The Red Sox advertise and sell tickets to consumers through, among other channels, their official website (https://www.mlb.com/redsox).

61.    During the relevant time period, the Red Sox maintained a page on their website on which they advertised the purported ticket prices for each ticket category in each home game in their season.   *See*  https://www.mlb.com/redsox/tickets/single-game-tickets ("Single Game Tickets" page).  On that page, the Red Sox listed each category of tickets for each individual game, with a specific ticket price quoted for each category.  A "Buy Now" link was shown for each game.

---

[14] *See* Kurt Badenhausen, *Dodgers, Yankees Run Away With MLB Ticket Revenue Race*, SPORTICO (May 30, 2025), *available at* https://www.sportico.com/leagues/baseball/2025/dodgers-yankees-mlb-ticket-revenue-1234854483/.

62.    The image below provides an example of how this webpage appeared in 2023, in connection with the Red Sox's advertisements of their ticket prices for games on August 4 through 7, 2023:



| | Friday Aug 4 7:10pm vs TOR | Saturday Aug 5 4:10pm vs TOR | Sunday Aug 6 1:35pm vs TOR | Monday Aug 7 7:10pm vs KC |
|---|---|---|---|---|
| | Buy Now | Buy Now | Buy Now | Buy Now |
| **DEFAULT** | | | | |
| Field Box 39-50 (Home Plate, Rows A-E) | $187.00 | $214.00 | $186.00 | $156.00 |
| Upper Field Box 39-50 (Rows F-M) | $179.00 | $206.00 | $178.00 | $145.00 |
| Upper Field Box 30-38 (Rows F-M) | $185.00 | $212.00 | $184.00 | $154.00 |
| Lower Field Box 30-38 (Rows A-E) | $177.00 | $203.00 | $176.00 | $143.00 |
| Lower Field Box 51-60 (Rows A-E) | $185.00 | $212.00 | $184.00 | $154.00 |

63.    The ticket prices advertised on the Red Sox's Single Game Tickets page were false.

64.    A customer who followed the "Buy Now" link could not purchase tickets at the prices listed.  Instead, once consumers tried to purchase tickets and reached the final step in the Red Sox's purchase flow, the Red Sox revealed that the ticket prices would be inflated with added junk fees.

65.    For example, as shown above, the Red Sox's online pricing matrix advertised that "Field Box" tickets for the August 4, 2023 game against the Toronto Blue Jays would cost $187.

66.    That advertisement was false.

67.    Customers could not follow the "Buy Now" link to purchase a Field Box ticket to that game for $187.  Rather, that ticket would actually cost at least $195 due to undisclosed junk fees that the Red Sox did not reveal until the checkout page.

68.     On both their official website and through the MLB Ballpark mobile application, the Red Sox advertised ticket prices within their single-game ticket sales flow during the relevant time period.

69.     The Red Sox's single-game ticket sales flow through their official website and the MLB Ballpark mobile application generally followed four steps.

70.     *First*, the buyer would select a game.

71.     *Second*, the Red Sox would display the available tickets for that game.

72.     During this second step, the buyer would have the option of viewing the tickets from a seating map of the stadium or from a list of different sections, with each section accompanied by supposed prices for its tickets.  The buyer would also have the ability to filter tickets by price.

73.     *Third*, the buyer would select specific seats, each of which would be advertised at a specific price.

74.     The two images below, which the Red Sox themselves provide in their online ticket-buying guide at https://www.mlb.com/redsox/tickets/my-tickets-guide, illustrate the price filter available in the second step and an example of a ticket price quote from the third step, respectively.[15]

---

[15] These images show tickets from 2020; the Red Sox's ticket sales flow was substantially the same in 2022-2024.




75.    *Fourth*, the buyer would proceed to the checkout page, which would prompt the buyer to enter credit card information and complete the transaction.   The image below is an example of the checkout page applicable to an online purchase in 2022.



76. On that checkout page, the Red Sox would, for the first time, reveal the true price of the tickets the buyer had selected, by disclosing for the first time the existence and amount of the mandatory junk fees for those tickets.

77. Also on the checkout page, the Red Sox would include a countdown clock. The Red Sox warned purchasers at this step that their tickets would be "released" if they did not complete the order within this time frame.

78. Accordingly, in order to complete their transaction without having their tickets "released," purchasers had to (1) correctly input their payment information; (2) check a box indicating that they agreed to various "Terms and Conditions," including those contained on another hyperlinked page; and (3) review and ensure the accuracy of all the information on the checkout screen regarding their order—all before the timer reached zero.

79.     The Red Sox's timer at this step only gave customers five minutes to complete their transaction.

80.     The hyperlinked "Terms and Conditions" alone contained over 7,000 words.  At ordinary reading speeds, it would take longer to read all of those Terms and Conditions—let alone read them all *and* complete the other necessary checkout tasks—than the countdown timer allowed.

81.     It was during this same step of the sales process, with a ticking timer and more work than could be done before the timer expired, that the Red Sox required buyers to notice and react to the late disclosure of their junk fees.

82.     This sales flow for sales through the Red Sox's website and the MLB Ballpark mobile application, including its use of drip pricing to hide junk fees until the fourth step, was in place from before January 2022 through at least the end of the 2024 baseball season.

      **ii.**      **The Red Sox's Junk Fees and Drip Pricing Were Unfair and Deceptive**

83.     The Red Sox's advertising did not disclose the existence or amount of the mandatory "fees" that they would add to the price of each ticket.  Rather, the ticket prices the Red Sox advertised, including within their online sales flow, misleadingly excluded the junk fees that the Red Sox knew they would assess.

84.     The Red Sox applied various labels to the junk fees they charged.  Most commonly, they would assess fees they labeled "Per-Ticket Fees" and "Order Fees."

85.     The Red Sox did not offer any explanation within their sales flow about what purpose these "Per-Ticket Fees" or "Order Fees" were meant to serve.  Nor did they offer such an explanation anywhere else on their website.

86.    The reason the Red Sox did not try to explain the purpose of their "Per-Ticket Fees" and "Order Fees" is obvious: those fees did not relate to any service or feature that buyers might voluntarily choose to purchase.

87.    Nor did the "Per-Ticket Fees" and "Order Fees" relate to the Red Sox's actual costs of processing tickets or orders.

88.    It does not cost the Red Sox more to issue a ticket to a game against the Yankees than to a game against the Brewers, yet the Red Sox charged different "Per-Ticket Fees" depending on that factor (and others).

89.    Indeed, the "Per-Ticket Fees" could vary between games for the very same seat in Fenway Park.

90.    Likewise, it does not cost the Red Sox $7 to process each electronic ticket order.

91.    The Red Sox's junk fees were difficult for buyers to predict.

92.    The Red Sox charged "Per-Ticket Fees" for, among others, single-game tickets purchased through their website or the MLB Ballpark mobile application. The "Per-Ticket Fees" were generally higher for tickets with higher initial price quotes—*i.e.*, the Red Sox would impose higher fees on buyers who had initially signaled they were willing to buy more expensive tickets.

93.    But the exact amount of the "Per-Ticket Fees" varied depending on factors undisclosed to the public. The "Per-Ticket Fees" could sometimes be as low as $0.50 per ticket and could reach at least as high as $8.50 for some tickets. Buyers could not realistically know in advance what "Per-Ticket Fees" would apply to their purchases.

94.    On top of the "Per-Ticket Fees," purchasers often also had to pay "Order Fees." These "Order Fees" were typically $7 per order regardless of the price or quantity of tickets

purchased.  Because "Order Fees" were $7 regardless whether the purchaser bought one $15 ticket or twelve $100 tickets, these fees disproportionately increased the cost of lower-priced tickets.

95.     On some occasions, however, the Red Sox did not charge "Order Fees," and the Red Sox did not make clear to buyers in advance when they would or would not charge "Order Fees."

96.     Depending on the game and the price of the ticket, the Red Sox's tickets, with fees, could cost as much as 150% more than the initially-advertised price.

97.     For example, as described in greater detail below, Ms. Smith once paid $31.50 for a ticket that the Red Sox initially advertised as just $21.

98.     The Red Sox charged undisclosed junk fees even when they advertised tickets in print or digital media as being available at a certain price.

99.     For instance, for several years, the Red Sox advertised a promotion sometimes called "Student 9s," in which they advertised tickets "Starting at $9" for high school and college students.  The image below is an example of an online advertisement the Red Sox ran for this promotion.



100.    But the Red Sox added junk fees to those tickets, such that there were no $9 tickets available on their website; the cheapest tickets available through this online promotion actually cost $9.50, even if a buyer clicked through links advertising tickets that supposedly started at $9.

101.    The Red Sox did not offer buyers a realistic alternative to avoid these mandatory junk fees.  Some MLB teams offered tickets with lower or no fees at their box offices, but the Red Sox made clear that this was not an option for their fans for at least part of the relevant period.  In announcing ticket sales for their 2022 season, for example, the Red Sox stated that their tickets "will not be sold at the Fenway Park box office."[16]

102.    As a practical matter, purchasers buying Red Sox tickets overwhelmingly used the Red Sox's online ticket sales process to buy their tickets, and they were forced to pay unfair and deceptive junk fees in connection with those purchases.

103.    Moreover, although the Red Sox occasionally ran promotions in which they offered to sell tickets with lower or no fees for a limited time, they did not advertise to customers the existence of any non-promotional fee-free avenues to buy their single-game tickets.

104.    The reason the Red Sox did not alert their customers to fee-free alternatives is simple:  they generated significant amounts of additional revenue from their unfair and deceptive drip pricing and junk fee practices.

105.    Public reporting indicates that the Red Sox sell well more than 2.5 million tickets per year to baseball games alone.  Assuming conservatively that only 20% of those tickets were tainted by the Red Sox's drip pricing and junk fee practices, and further assuming conservatively that the average junk fees per ticket were just $4, that would mean the Red Sox unlawfully obtained more than $6 million from class members through their unlawful practices during the relevant time period.  Given the conservative nature of these assumptions, the actual damages are likely far in excess of that amount.

---

[16] *See, e.g.*, MLB, *Red Sox Tickets for June and July Games Go on Sale Thursday, March 31, at 10 a.m.*, MLB.com (Mar. 29, 2022), *available at* https://www.mlb.com/press-release/press-release-red-sox-tickets-for-june-july-on-sale-march-31-2022.

### iii.    The Red Sox Voluntarily Adopted Their Unfair and Deceptive Practices

106.    The Red Sox were not compelled to hide the existence and amount of their junk fees until the final step in their sales process.

107.    Had they chosen to do so, the Red Sox could have revealed the true, total cost of their tickets from the outset in their advertising and in their sales flow.

108.    Indeed, the Red Sox's own conduct demonstrates that their use of unfair and deceptive drip pricing practices was entirely voluntary.

109.    Although they persisted in using drip pricing through at least the end of the 2024 baseball season, the Red Sox voluntarily changed their disclosure practices for at least part of the 2025 baseball season.  Under their new approach, the Red Sox typically state the true, total cost of their tickets the first time they quote a ticket price, rather than hiding the existence and amount of fees until the final step of the checkout process.

110.    The Red Sox could have taken that approach for sales in the 2022 through 2024 baseball seasons as well.  They simply chose not to.

### iv.    Plaintiffs' Experiences with the Red Sox's Unfair and Deceptive Practices

111.    Plaintiff Damon Campagna purchased tickets on July 2, 2023 for a Red Sox game on July 7, 2023 against the Athletics.

112.    When purchasing his tickets, Mr. Campagna evaluated the different ticket options available through the Red Sox's online ticketing channels and ultimately decided on seats in the right field cantina section of Fenway Park, which the Red Sox initially stated cost $46 each.  Mr. Campagna chose those tickets because, while he found them expensive, they would still cost less than $50 each.

113.    In reality, however, the tickets Mr. Campagna chose cost more than $50 each: inclusive of fees, the tickets came out to an average price of approximately $53.83.

114.    Mr. Campagna ultimately paid $23.50 in unfair and deceptive junk fees for those tickets, which the Red Sox did not disclose in their initial price quotes or at any time before presenting the final checkout page.

115.    Mr. Campagna has not purchased any additional Red Sox tickets since 2023.

116.    Plaintiff Lily Rose Smith has purchased tickets from the Red Sox on several occasions and experienced a range of unfair and deceptive drip pricing and junk fee practices.

117.    On April 20, 2022, for example, Ms. Smith bought a grandstand ticket for a game against the Blue Jays that same day.

118.    The Red Sox initially advertised the price for that April 20, 2022 ticket as $21, but ultimately charged $31.50 after adding $10.50 in junk fees.

119.    On October 5, 2022, Ms. Smith bought a ticket under the "Student 9s" promotion for a game against the Tampa Bay Rays that same day.  But instead of charging the advertised $9, the Red Sox charged $9.50 after adding a $0.50 fee that was not disclosed prior to the checkout page.  The Red Sox did not charge a $7 "Order Fee" in connection with that transaction.

120.    On December 2, 2022, Ms. Smith bought a ticket from the Red Sox to attend the Fenway Bowl (a college football game) on December 17, 2022.  The Red Sox initially advertised the ticket cost as $45, but then added another $5.50 in junk fees at the final checkout page, for a total of $50.50.

121.    Ms. Smith has bought tickets on several other occasions as well, including both before and after the 2022 baseball season.

122.    Plaintiff Patrick Spaulding purchases Red Sox tickets for his family approximately once per baseball season, including during at least the 2022 and 2024 baseball seasons.  Each time he has purchased tickets from the Red Sox online, he has been presented with previously undisclosed junk fees at the final checkout page, resulting in significant increases above the prices he was initially quoted.

## PRE-SUIT DEMAND

123.    On December 11, 2025, Plaintiffs served Defendants with a written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9(3).  The demand identified the claimants, reasonably described the unfair and deceptive practices and the injuries suffered, and stated the relief sought on behalf of Plaintiffs and similarly situated purchasers.

124.    Defendants did not make a reasonable tender of relief within thirty days of receiving that demand letter.  Among other things, Defendants did not offer any relief to the absent members of the class, on whose behalf Plaintiffs expressly requested relief.

125.    Plaintiffs subsequently filed this action, in compliance with Mass. Gen. Laws ch. 93A, § 9(3).

## CLASS ALLEGATIONS

126.    This action is properly maintainable as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure ("Rule 23").

127.    This action is properly maintainable pursuant to Rule 23 because common questions of law and fact predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

128.    Plaintiffs seek certification of the following nationwide class (the "**Purchaser Class**"), consisting of the following individuals:

All persons who purchased tickets from the Red Sox between January 16, 2022 and the present, and in connection with such purchases paid additional fees that the Red Sox did not include within their initial price advertisements.

129.    Plaintiffs also seek certification of the following proposed subclasses, consisting of the following individuals:

**Massachusetts Subclass:**  All Massachusetts residents who purchased tickets from the Red Sox between January 16, 2022 and the present, and in connection with such purchases paid additional fees that the Red Sox did not include within their initial price advertisements.

**Rhode Island Subclass:**  All Rhode Island residents who purchased tickets from the Red Sox between January 16, 2022 and the present for personal, family, or household purposes, and in connection with such purchases paid additional fees that the Red Sox did not include within their initial price advertisements.

130.    Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class and subclass definitions as discovery in this action progresses.  Plaintiffs further explicitly reserve their right to seek certification of additional subclasses, including additional state subclasses pursuing relief under the consumer protection laws of additional states.

131.    The following people are excluded from the Purchaser Class and the Subclasses: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers and directors; (3) employees, officers, and attorneys for Defendants, including Defendants' counsel, and non-attorney employees of their firms; (4) persons who properly execute and file a timely request for exclusion from the Purchaser Class; (5) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; and (6) the legal representatives, successors, and assigns of any such excluded persons.

132.    The Red Sox's deceptive junk fee practices violated each class member's statutory right to be free from unfair and deceptive practices in connection with their purchases of tickets from the Red Sox.

133.    The Red Sox's unfair and deceptive practices have resulted in actual injury and harm to the class members in the amount of the junk fees they paid that were excluded from the Red Sox's advertised prices.

134.    **Numerosity.**  With 81 Red Sox home games per season (along with other events at Fenway Park) and tens of thousands of tickets sold per game, the Red Sox have sold millions of tickets during the relevant class period.  The deceptive conduct above applies, at the very least, to substantially all of the Red Sox's online single-game ticket sales.  This means the Red Sox sold tens of thousands, if not hundreds of thousands, of tickets in violation of Mass. Gen. Laws ch. 93A or other applicable state consumer protection laws.  The Purchaser Class and each Subclass is so large that the joinder of all members is impracticable.

135.    **Commonality.**   The Purchaser Class and each Subclass in this action faces common questions of law and fact.  In particular, common questions for the Purchaser Class include:  (1) what the Red Sox disclosed or omitted regarding their ticket fees; (2) whether such disclosures or omissions were unfair or deceptive; (3) whether the Red Sox's practices regarding their ticket fees and related disclosures violated Mass. Gen. Laws ch. 93A; (4) whether the Red Sox's practices regarding their ticket fees and related disclosures violated 940 Mass. Code Regs. § 3.04 by having "the capacity or tendency or effect of deceiving buyers or prospective buyers as to the . . . price of a product"; (5) whether the Red Sox's practices regarding their ticket fees and related disclosures violated 940 Mass. Code Regs. § 3.13 by charging purchasers a price that is not the "advertised price," by representing that "a product or service may be purchased for a specified

price when such is not the case," or by otherwise deceiving purchasers as to price; (6) whether the Red Sox's practices regarding their ticket fees and related disclosures violated 940 Mass. Code Regs. § 3.16 by "fail[ing] to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction"; (7) whether and in what amount damages are warranted; (8) whether and in what amount multiple damages are warranted; and (9) the amount of attorney's fees, costs, interest, and other relief to be awarded.

136.    **Predominance.**  These common issues predominate over individualized inquiries in this action because the Red Sox's liability can be established as to all members of the Purchaser Class and of each Subclass.

137.    **Typicality.**  Plaintiffs' claims are typical of the claims that could be asserted by all members of the Purchaser Class and each Subclass that they seek to represent, and Plaintiffs' claims arise from the Red Sox's practices as applicable to all class members.  All class members' claims arise from the Red Sox's deceptive junk fee practices applicable to all such class members and are based on the same legal theories as to how and why those practices violate Mass. Gen. Laws ch. 93A.  The claims of each member of each Subclass are similarly based on the same legal theories as to how and why those practices violate relevant state laws.

138.    **Adequacy.**  Plaintiffs will adequately represent the interests of those class members because there are no conflicts between Plaintiffs and absent class members, and because Plaintiffs' counsel has the experience and skill to zealously advocate for the interests of the members of the Purchaser Class and the Subclasses.

139.    **Superiority.**  There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a

realistic means for members of the Purchaser Class and the Subclasses to recover damages; the damages suffered by members of the Purchaser Class and the Subclasses may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Purchaser Class and the Subclasses may be unaware that they have legal recourse for the alleged conduct; and because issues common to members of the Purchaser Class and the Subclasses can be most effectively managed in a single proceeding.

140.    Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## <u>COUNT I</u>

**Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9
On Behalf of the Purchaser Class**

141.    The allegations of Paragraphs 1 through 140 are re-alleged as if fully set forth herein.

142.    Plaintiffs, on behalf of the proposed Purchaser Class, bring this count against the Red Sox under Mass. Gen. Laws ch. 93A, §§ 2, 9.

143.    Defendants are "persons" that engage in "trade" and "commerce" under Mass. Gen. Laws ch. 93A, § 1(a)-(b), by (among other things) engaging in the advertising and sale of tickets for events at Fenway Park.

144.    Defendants' drip pricing and junk fee practices constitute "unfair or deceptive acts or practices" under Mass. Gen. Laws ch. 93A, § 2(a), including in violation of 940 Mass. Code Regs. §§ 3.04, 3.13, and 3.16.

145.    Cost is an important component of consumer transactions, including the Red Sox's ticket sales.  Drip pricing and junk fees misrepresent the price of a ticket and total cost to the purchaser.

146.    Defendants (among other things) misrepresented ticket prices, failed to disclose material facts necessary to prevent deception (the existence and amount of mandatory fees), engaged in practices with the tendency or effect of deceiving customers about their ticket prices, advertised that tickets could be bought at a specified price when they could not be, and employed bait-and-switch tactics by luring purchasers with low advertised prices while revealing mandatory fees only at the end of the purchase flow.

147.    Defendants' omissions and misrepresentations were "deceptive" under Mass. Gen. Laws ch. 93A, § 2(a), because, among other reasons, they had a tendency to mislead by causing class members to believe Red Sox tickets could be purchased at prices lower than those the Red Sox ultimately charged.

148.    Defendants' omissions and misrepresentations were "unfair" under Mass. Gen. Laws ch. 93A, § 2(a), because, among other reasons, they deprived class members of information about the true prices for purchasing tickets from the Red Sox at the time they were considering a purchase, causing them substantial economic injury.

149.    Class members suffered substantial economic injury as a result of Defendants' illegal practices, including (among other things) because they paid more than the advertised or initially quoted prices due to late-disclosed mandatory fees and increased total prices.

150.    Defendants' conduct was willful or knowing.  Their ticketing and advertising flow intentionally concealed mandatory fees until late in the purchase process.  Defendants' refusal to grant relief in response to Plaintiffs' demand was made in bad faith and with knowledge or reason to know that their practices violate Mass. Gen. Laws ch. 93A, § 2.

151.    Plaintiffs complied with chapter 93A, section 9(3)'s pre-suit demand requirement. Defendants did not make a reasonable tender of relief within thirty days of the demand.

## COUNT II

**Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9**
**On Behalf of the Massachusetts Subclass**

152.    The allegations of Paragraphs 1 through 151 are re-alleged as if fully set forth herein.

153.    Plaintiffs, on behalf of the proposed Massachusetts Subclass, bring this count against the Red Sox under Mass. Gen. Laws ch. 93A, §§ 2, 9.

154.    For the same reasons set forth above in connection with Count I, the members of the Massachusetts Subclass suffered substantial economic injury as a result of Defendants' illegal practices.

## COUNT III

**Violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act,**
**R.I. Gen. Laws § 6-13.1-1 *et seq.***
**On Behalf of the Rhode Island Subclass**

155.    The allegations of Paragraphs 1 through 154 are re-alleged as if fully set forth herein.

156.    Plaintiffs, on behalf of the proposed Rhode Island Subclass, bring this count against the Red Sox under R.I. Gen. Laws § 6-13.1-5.2.

157.    Defendants are "[p]ersons" that engage in "[t]rade" and "commerce" under R.I. Gen. Laws § 6-13.1-1(3) and (5), by (among other things) engaging in the advertising and sale of tickets for events at Fenway Park.

158.    Defendants' drip pricing and junk fee practices constitute "[u]nfair methods of competition and unfair or deceptive acts or practices" under R.I. Gen. Laws § 6-13.1-1(6).

159.    Plaintiffs, as well as the members of the Rhode Island Subclass, purchased Red Sox tickets for personal, family, or household use.

160.    Defendants (among other things) advertised tickets at prices at which they did not intend to sell the tickets, engaged in conduct that creates a likelihood of confusion or misunderstanding for consumers, used acts or practices that are unfair or deceptive to consumers, and used methods, acts, or practices that mislead or deceive members of the public in a material respect.

161.    Rhode Island Subclass members suffered substantial economic injury as a result of Defendants' illegal practices, including (among other things) because they paid more than the advertised or initially quoted prices due to late-disclosed mandatory fees and increased total prices.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs, on behalf of the proposed Purchaser Class and the Subclasses, pray for judgment against Defendants and respectfully request that the Court grant the following relief:

A.    Repayment by Defendants, to each member of the Purchaser Class (including Plaintiffs) and to each member of the Massachusetts Subclass, of actual damages consisting of all fees Defendants charged after omitting such fees from their initial price quotes or advertisements, or $25 per class member, whichever is greater, *see* Mass. Gen. Laws ch. 93A, § 9(3);

B.    Award each member of the Purchaser Class and the Massachusetts Subclass up to treble actual damages, or $25 per class member, whichever is greater, under Mass. Gen. Laws ch. 93A, § 9(3) because Defendants' violations were willful and knowing and/or Defendants refused to grant relief in bad faith after demand;

C.  Require payment of interest on such amounts awarded to the Purchaser Class or Massachusetts Subclass, calculated at the statutory rate of 12% per annum, *see* Mass. Gen. Laws ch. 231, § 6B;

D.  Repayment by Defendants, to each member of the Rhode Island Subclass, of actual damages consisting of all fees Defendants charged after omitting such fees from their initial price quotes or advertisements, or $500 per subclass member, whichever is greater, *see* R.I. Gen. Laws § 6-13.1-5.2(a);

E.  Award each member of the Rhode Island Subclass treble actual damages, or $500 per Rhode Island Subclass member, whichever is greater, under R.I. Gen. Laws § 6-13.1-5.2(a);

F.  Require payment of interest on such amounts awarded to the members of the Rhode Island Subclass, calculated at the statutory rate of 12% per annum, *see* R.I. Gen. Laws, § 9-21-10;

G.  Award reasonable attorneys' fees and costs, including under Mass. Gen. Laws ch. 93A, § 9(4) and R.I. Gen. Laws § 6-13.1-5.2(d);

H.  Restitution by Defendants, to each member of the Purchaser Class (including Plaintiffs) and to each member of the Subclasses, of fees Defendants charged after omitting such fees from their initial price quotes or advertisements;

I.  Grant injunctive relief prohibiting Defendants from resuming their unlawful practices pursuant to Mass. Gen. Laws ch. 93A, § 9(1) and/or R.I. Gen. Laws § 6-13.1-5.2(e); and

J.  Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: January 16, 2026             Respectfully submitted,

By:  */s/ Bradley E. Oppenheimer*     
      Bradley E. Oppenheimer (BBO No. 688330)
      Daniel G. Bird (*pro hac vice* motion to be filed)
      Justin B. Berg (*pro hac vice* motion to be filed)
      Alyssa J. Picard (*pro hac vice* motion to be filed)
      KELLOGG, HANSEN, TODD,
       FIGEL & FREDERICK, P.L.L.C.
      1615 M Street, N.W., Suite 400
      Washington, D.C. 20036
      Tel.: (202) 326-7000
      Fax: (202) 326-7999
      Email: boppenheimer@kellogghansen.com
      Email: dbird@kellogghansen.com
      Email: jberg@kellogghansen.com
      Email: apicard@kellogghansen.com

      Albert Y. Pak (*pro hac vice* motion to be filed)
      Noah Heinz (*pro hac vice* motion to be filed)
      PAK HEINZ P.L.L.C.
      20 F Street N.W., 7th Floor
      Washington, D.C. 20001
      Tel.: (202) 505-6350
      Email: albert.pak@pakheinz.com
      Email: noah.heinz@pakheinz.com

      *Counsel for Plaintiffs*